IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| BETH FEELY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:08cv1212 (GBL/TCB) |
| | ) | |
| TOTAL REALTY MANAGEMENT, | ) | |
| LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| STEVEN ABRAHAM, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:09cv6 (GBL/TCB) |
| | ) | |
| TOTAL REALTY MANAGEMENT, | ) | |
| LLC, et al., | ) | CONSOLIDATED |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS BETH FEELEY, ET AL.'S MEMORANDUM IN
OPPOSITION TO DEFENDANTS COOPERATIVE BANK FOR SAVINGS, INC.,
AND FREDERICK WILLETTS, III'S MOTION TO DISMISS
THE AMENDED COMPLAINT**

Plaintiffs Jeanne & Randall Balderson, David Bays, Terrence & Patrice Brown, Cheryl & Chris Dolan, Mary & Matthew Frederick, Stacey Freed & Thomas Erbland, William & Babette Hale, John Hill, Frederick & Laura Hunter, David & Elisabeth J. Jackson, Kevin Keeton, Kristi & Michael Lalli, Sean Mykietyn, Jay Patel, Sanford Payne, Joseph Pozda and Albert & Kathleen Tutem ("Plaintiffs"), appearing by counsel, hereby submit the following Memorandum in Opposition to Defendant Cooperative Bank for Savings, Inc.  ("Cooperative")

and Frederick Willetts, III's ("Willetts") (collectively "Cooperative Defendants") Motion to

Dismiss.  Plaintiffs request this Court deny Cooperative Defendants' Motion to Dismiss.

## STATEMENT OF THE CASE

Plaintiffs filed their Amended Complaint seeking relief against a number of Defendants.

With regard to Cooperative, the Amended Complaint asserts separate counts for (i) rescission of

certain promissory notes and deeds of trust held by  Cooperative pursuant to the Interstate Land

Sales Full Disclosure Act ("ILSA") (ii) violation of the North Carolina Unfair and Deceptive

Trade Practices Act (the "NCUDTPA"), (iii) civil conspiracy to commit fraud, and (iv)

declaratory judgment rendering certain promissory notes and deeds of trust held by

Cooperative void.  Willetts, the trustee under the deeds of trust, is named as a defendant in the

declaratory judgment count.  Pursuant to Rules 12(b)(1), 12(b)(2), 12(b)(3) and 12(b)(6) of the

Federal Rules of Civil Procedure, Cooperative and Willetts have filed a Motion to dismiss for

failure to state a claim, lack of subject matter jurisdiction, lack of personal jurisdiction and

improper venue.

## FACTS

The Amended Complaint contains detailed allegations regarding all of the Defendants.

The relevant factual allegations as they relate to the Cooperative Defendants' actions, are set

forth with particularity below as these allegations form the foundation of Plaintiffs' opposition.

Total Realty Management ("TRM") orchestrated and operated a scheme of purchasing

and immediately reselling unimproved residential lots in planned subdivisions in North Carolina

and South Carolina. Am. Comp. ¶ 110.  TRM purchased unimproved residential lots at fair

market prices and immediately resold such lots to third parties, representing that they were good

investments and that the purchasers could expect large profits within months. Am. Comp. ¶ 112.

TRM promised and promoted seemingly legitimate investments in real estate, but in reality was operating a highly successful scheme designed for the benefit of TRM and its principals to the damage of Plaintiffs.  Am. Comp. ¶ 113.

In order to accomplish its business plan TRM needed to (i) mislead each purchaser regarding virtually every material aspect of the transaction; and (ii) procure for the purchaser the financing for this fraudulent transaction.  Am. Comp. ¶ 115.  These goals were accomplished by (i) entering into an arrangement with certain appraisers and loan officers, (ii) using a clever and fraudulent marketing strategy that relied heavily upon misrepresentation; (iii) controlling the loan application process; and (iv) controlling the settlement process.  Am. Comp. ¶ 116.

The first step in TRM's scheme was to verify that potential lenders would be able to obtain lot appraisals for amounts grossly in excess of the lots' then fair market value. This step was crucial because the lots that TRM anticipated selling to its purchasers for a purchase price typically between $300,000 and $400,000 were in fact available to the general public for approximately $150,000.  Am. Comp. ¶ 117.  In order to create inflated appraisals, TRM orchestrated sham transactions, in which lots were purchased with cash for prices grossly in excess of the fair market value.  These transactions were for the sole purpose of establishing model inflated appraisal templates for use in future lot sales.  TRM made arrangements with certain loan officers and appraisers to ensure appraisals would be generated using comparable sales at the inflated price, rather than the numerous arms-length transactions occurring at the much lower fair market price.  Since TRM was able to direct purchasers to certain cooperating loan officers, it could be certain that only appraisers who were participants in the illegal agreement to generate inflated appraisals would be used. Am. Comp. ¶ 118.

3

Wholesale misrepresentation and rigged appraisals, however, were not enough to guarantee the success of TRM's enterprise. To do that, TRM would have to be intimately involved in the loan process. TRM would direct purchasers to loan officers with whom TRM was working. TRM would control the entire process, including dealing directly with the loan officers. TRM was thus able to manipulate the purchasers' financial information so that they would qualify for loans. This ensured that purchasers would be able to qualify for loans for as many lots as they wanted to purchase. Of course, loan officers from participating lenders obtained the appraisals from the stable of appraisers whom the loan officers or TRM knew would generate inflated appraisals. Am. Comp. ¶ 123.

The net effect of TRM's arrangement with the loan officers was (i) to qualify purchasers for loans for which they would not normally qualify; (ii) to create a mistaken belief in the purchasers that the transactions were legitimate, fair market value transactions; and (3) to facilitate significant financial inducements with which TRM could induce sales. Am. Comp. ¶ 124.

Once financing was obtained from a participating lender, TRM could proceed to settlement. TRM had no lots in its inventory. Not wanting to use its own money for lot acquisition, TRM would conduct a concurrent settlement of both its acquisition purchase and its out-sale at the same settlement company, usually the deeds being recorded on the same day and within minutes of each other for each transaction. At settlement, TRM would use part of the sales proceeds from each lot to pay for its acquisition of that lot, along with closing costs. After settlement, TRM would use part of the sales proceeds to fund the first year or two of mortgage payments it gave to the purchaser, and it would use part of the proceeds to pay referral fee commissions. The remainder was TRM's profit. Am. Comp. ¶ 125.

4

TRM resold (flipped) the lots it purchased in the Subdivisions by selling the lots to Plaintiffs on the same day TRM purchased the lots.  Am. Comp. ¶ 166.  Before closing on the loans, Cooperative knew that the sales to Plaintiffs were flips, since they received Preliminary Title Opinions from Ladd S. Gasparovic, a practicing attorney in North Carolina, informing the banks in advance of settlement that title to the lots vested in R.A. North, Maryville or others (when there were double flips), rather than in TRM, at the time of loan commitment.  Am. Comp. ¶ 502.

Michael McCracken [the Chief Financial Officer and agent of TRM] informed appraiser James S. Wagoner, who performed appraisals for Cooperative for loans to Cannonsgate and Summerhouse purchasers, that TRM lot sales were simultaneous transactions, that there were sometimes multiple transactions involving the same lot within one year, and that TRM was listed on contracts as the seller even when it did not hold title to the lots. Am. Comp. ¶ 506. Cooperative continued to fund purchases for TRM buyers after Michael McCracken so informed James S. Wagoner, without adjusting the value of the collateral to account for the impact of simultaneous transactions and multiple transactions involving the same lot.  Am. Comp. ¶ 507. Even after they were informed by appraisers that the TRM lot sales were at overvalued prices, Cooperative continued to finance the lots at the inflated prices.  Am. Comp. ¶ 508.  Cooperative Bank continued to finance lot sales to Plaintiffs after appraiser Benjamin Herring specifically informed the bank that he had declined to appraise the lots at the inflated TRM prices, and that he had been told and was concerned for the bank that a female appraiser (presumably, Emily Adams who performed all or nearly all of the appraisals for Cooperative) was appraising the lots above their fair market value.  Am. Comp. ¶ 525.

During the spring and summer of 2007, TRM's efforts to find new banks were successful, and TRM commenced its relationship with Cooperative, which designed a specialty lot loan program for TRM. Their specialty programs: (1) provided for the banks to give 80% or 90% financing for stated income, no documentation, or reduced documentation lot loans at the Subdivisions, (2) allowed TRM to make the down payment for the purchaser in the form of purchase money second trust financing that was sometimes set up as a mere sham, and (3) allowed TRM to pay a lump-sum of one to two years of advance mortgage interest payments for the purchaser into escrow at the bank. Am. Comp. ¶ 551.

Cooperative was aware that in at least some instances the purchase mortgage second trust financing by TRM for 20% of the purchase price of the lots in the Subdivisions was a mere sham, and that TRM's intent was to release the second trusts immediately for the purchasers. Am. Comp. ¶ 552. Ladd S. Gasparovic completed the settlement process for all of the loans financed by Cooperative for Plaintiffs' lot purchases from TRM. Am. Comp. ¶ 553. The signed documents Cooperative instructed Ladd Gasparovic to return in the package to Cooperative upon closing the loan included both the signed purchase mortgage second trusts and signed releases for the purchase mortgage second trusts. Am. Comp. ¶ 554. At a minimum, Cooperative knew that the lot purchase prices and appraisals were inflated at least to the extent of the 20% sham second mortgage amount and also in the amount of the financial incentives provided to the Plaintiffs. Am. Comp. ¶ 555.

All of the Bank Defendants [including Cooperative] used portfolio loan products for the loans to TRM purchasers, including Plaintiffs. Because the loans were portfolio loans that were kept for servicing by the Bank Defendants rather than sold on the secondary market, the loans went through only in-house underwriting at each bank. Am. Comp. ¶ 557. Cooperative stopped

lending funds in the Subdivisions after the bank returned telephone messages appraiser Benjamin Herring left for Erik Gray and Pembroke Nash at Cooperative, wherein Benjamin Herring stated that the lot values in the TRM sales were highly inflated. Am. Comp. ¶ 560. The fact that Cooperative stopped lending funds for TRM sales after they became aware of loan origination and underwriting failures and/or of flawed appraisals evidences the banks' awareness that the loans had been improperly originated, underwritten, and/or appraised. Am. Comp. ¶ 562.

Knowledge of Ladd Gasparovic related to the financing of the lots by Cooperative is imputed to Cooperative. Am. Comp. ¶ 609. Ladd Gasparovic's knowledge that the TRM second trusts for the sales were to be immediately released and his consequent knowledge that the lot purchase prices and appraisals were inflated at least to the extent of the 20% sham second mortgage amount and also in the amount of the financial incentives provided to the Plaintiffs, is imputed to Cooperative. Am. Comp. ¶ 612. Ladd Gasparovic's knowledge that the lots were being purchased by TRM and then immediately resold for approximately twice the price, and that other comparable lots were being sold in the Subdivisions for the lower pre-flip price at the same time, and therefore, that the appraisals for Plaintiffs' loans were inflated is imputed to Cooperative. Am. Comp. ¶ 613.

Cooperative, through its employees and agents, agreed to participate in TRM's fraudulent scheme by, among other things, knowingly and intentionally concealing material facts relative to the fair market value of the lots in Summerhouse and Cannonsgate, soliciting and obtaining inflated appraisals for those lots, ignoring the significant financial incentives TRM provided in the transactions with the Cooperative Plaintiffs, working with unlicensed TRM mortgage brokers, failing to communicate at all with Cooperative Plaintiffs and instead

communicating with TRM, ignoring loan origination, underwriting, or closing procedures mandated by law, and failing to comply with the provisions of the NCMLA, as more particularly set forth in the preceding paragraphs of the Amended Complaint. Am. Comp. ¶ 1154.  Cooperative and TRM agreed to engage in an illegal conspiracy by arranging for and providing financing in an unlawful manner.  Am. Comp. ¶ 1155.  Cooperative committed the overt act of agreeing with TRM's selection, or itself selecting, an appraiser for each lot it financed who could be relied upon to inflate the appraised value, and working with unlicensed TRM mortgage brokers.  Am. Comp. ¶ 1156.

The factual allegations set forth in the Amended Complaint support the conclusion that (i) this Court has subject matter jurisdiction over the Cooperative Defendants and the claims against them; (ii) venue is proper in this Court; (iii) that this Court may exercise personal jurisdiction over the Cooperative Defendants and (iii) Plaintiffs have stated claims against these Defendants.  The Cooperative Defendants Motion to Dismiss should be dismissed for the reasons set forth below.

## ARGUMENT

## I.    THE PLAINTIFFS HAVE PROPOERLY STATED THEIR CAUSES OF ACTION

Cooperative Defendants' Rule 12(b)(6) motion to dismiss should be denied because the Plaintiffs have asserted facts in their Amended Complaint which support their claims and entitle them to relief.  Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134, n.4 (4th Cir. 1993)(citations omitted).  "In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff." Id.  The Federal Rules of Civil Procedure "require[] only a 'short and plain

statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).   This Court need only determine that the Amended Complaint contains sufficient factual allegations to "state a claim to relief that is plausible on its face." Id, 550 U.S. 544, 570, 127 S.Ct. 1955, 1974 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009)(citing Twombly, 550 U.S. at 556, 127 S.Ct. at 1955).  During the Motion to Dismiss stage, a Plaintiff is only required to show that the claims are plausible and need not satisfy a "probability requirement." Id.  Plaintiffs' Amended Complaint alleges facts sufficient to state all elements of their claims and should not be dismissed.  Bass v. E.I. Duport de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003).

### A.  The Allegations Against Cooperative Are Plausible.

The Cooperative Defendants attack the Amended Complaint on the basis that there "is no plausible reason for a bank to make under-collateralized loans." However, Cooperative seems to equate "plausible" with "reasonable" or "well-advised".  While these loans in question were likely to the detriment of the shareholders of Cooperative, the employees of Cooperative received a significant financial reward for their conduct.

The Court can take judicial notice of the current recession, which has been in some part (perhaps in large part) a result our largest lenders engaging in lending practices that were reckless, ill-advised and some cases wrongful. Banks like Cooperative are composed of many employees who have short-term financial incentives that may differ from the long-term interests

of their employer bank or the bank's shareholders. When Cooperative asserts that there has been

no allegation as to "why making under-collateralized loans would be remotely in its self-

interest," its assertion is belied by two facts: (i) it was in Cooperative's employees' financial

interest to make as many loans as they could, which makes the employees' conduct (in the

absence of proper oversight) not only plausible, but predictable; and (ii) Cooperative, through

its employees, apparently not realizing how implausible their conduct was, actually made these

loans.

Cooperative's conduct in this case is not only comparable to the conduct of numerous

other financial institutions, it also has historical precedent.  As a result of the savings and loan

crisis in the 1980s, Congress passed the Financial Institutions Reform Recovery and

Enforcement Act of 1989 ("FIRREA") to among other things improve the supervision of

savings associations by strengthening capital, accounting, and other supervisory standards and

to curtail investments and other activities of savings associations that pose unacceptable risks to

the federal deposit insurance funds.  In addition, Congress expressly began regulating the

appraisal industry so that "real estate appraisals utilized in connection with federally related

transactions are performed in writing, in accordance with uniform standards, by individuals

whose competency has been demonstrated and whose professional conduct will be subject to

effective supervision." (12 U.S.C. § 3331).

As a result of FIRREA, the federal financial regulatory agencies adopted guidelines that

are applicable to all lenders.  These guidelines are codified in the Code of Federal Regulations.

12 C.F.R. 34.41 to12 C.F.R. 34.47.  Attached to the regulations is an inter-agency memorandum

which applies across the spectrum of federally related mortgages from the Federal Reserve

Board, the Office of Thrift Supervision, the Comptroller of the Currency and the FDIC.  Since

lenders were unable to police themselves and prevent public losses related to their activities

they became more highly regulated.  These regulations impose numerous requirements on

lenders relating to underwriting, loan origination, appraisal independence, loan to value ratios,

etc.

In reviewing this Amended Complaint, this Court should view the facts in the light most

favorable to the Plaintiffs.  See Mylan Labs., Inc., 7 F.3d 1130, 1134, n.4 (4th Cir.

1993)(citations omitted).  The Amended Complaint goes well beyond providing the Cooperative

Defendants with a short and plain statement of the claims; it sets forth 200 pages of facts,

actions and events providing the all defendants with fair notice of all claims and the grounds

supporting the Amended Complaint.  See Twombly, 550 U.S.at 555, 127 S.Ct. at 1964 (2007).

This Court can draw reasonable inferences that not only are the claims in the Amended

Complaint plausible, but that they actually occurred and that Cooperative is liable for the

misconduct set forth in the Amended Complaint.  See Ashcroft v. Iqbal 29 S.Ct. at 1949

(2009)(citing Twombly, 550 U.S. at 556, 127 S.Ct. at 1955).  This Court should deny the

Cooperative Defendants' motion to dismiss the Amended Complaint.

### B.  The Plaintiffs Have Stated A Cause Of Action For Rescission Of Their Promissory And Deeds of Trust.

Cooperative Defendants misunderstand the Amended Complaint.  Plaintiffs do not assert

that any of the lenders, including Cooperative, are "developers" or "agents" under ILSA.  The

Amended Complaint states that Cooperative was on notice of the applicability of ILSA and of

the Plaintiffs' remedy to rescind their promissory notes.   Plaintiffs assert that that the rescission

rights granted in 15 U.S.C. § 1703 of ILSA as set forth in Counts I and II apply to the

promissory notes executed in favor of Cooperative. See 24 C.F.R. §§ 1715.1 and 1715.2.

11

**1.  HUD's Interpretation of ILSA is Entitled to Deference.**

Congress provided the Secretary for Housing and Urban Development ("HUD") the authority to administer ILSA.  <u>Markowitz v. Northeast Land Co.</u>, 906 F.2d 100, 104 (3rd Cir. 1990)(quoting 15 U.S.C. § 1715(a)).  A court is required to defer to HUD's reasonable construction of ILSA because Congress vested HUD with the power to administer the statute. <u>Id.</u> at 105. (Citing <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 843-45, 104 S.Ct. 2778, 2781-83 (1984)).  <u>See also</u>  <u>Ahn v. Merrifield Town Center Limited Partnership</u>, 584 F.Supp.2d 848,  855, n.15 (E.D.Va. 2008) (noting that because HUD is the agency responsible for enforcing ILSFDA, its regulations "are entitled to <u>Chevron</u> deference…..").

**2.  The ILSA Right to Rescind Applies to All Promissory Notes.**

ILSA and the corresponding federal regulations promulgated by HUD provide that a purchaser has the right to rescind promissory notes pursuant to 15 U.S.C. § 1703. 24 C.F.R. § 1715.  Plaintiffs have a right to rescind the promissory notes because they did not receive property reports and/or there was no language included in the property reports regarding the right to rescind within seven days.  15 U.S.C. § 1703.  Indeed, the conduct of all of the Defendants, which caused the damages suffered by the Plaintiffs, is what Congress attempted to eliminate with ILSA.

"Congress enacted ILSA in response to 'wholesale interstate land fraud' during the 1960s, in which '[u]nscrupulous promoters utilized a variety of schemes to unload undesirable realty,' such as Florida swampland, onto 'unsuspecting and ill-informed investors and consumers.'" <u>Ahn</u>, 548 F.Supp.2d at 853 (Citations omitted).  Congress intended to ensure that,

"prior to purchasing certain types of real estate, a buyer [is] apprised of the information needed to make an informed decision." Id.

HUD, aware of the Congresses' intent to protect purchasers from unscrupulous sales of real estate, provided parties the right to rescind promissory notes.  HUD's reasonable construction of a party's right to rescind any promissory note under 15 U.S.C. §1703 provides:

> The purpose of this subpart A is to elaborate on the revocation rights in 15 U.S.C. 1703, by enumerating certain conditions under which purchasers may exercise revocation rights.  Generally, whenever revocation rights are available, they apply to promissory notes, as well as traditional agreements.

24 C.F.R. § 1715.1 (Emphasis added).  Further, 24 C.F.R. §1715.2 states:

> All purchasers have the option to revoke a contract or lease with regard to a lot not exempt . . .  until midnight of the seventh day after the day that the purchaser signs a contract or lease.  If a purchaser is entitled to a longer revocation period under State law, that period is deemed the Federal revocation period rather than the 7 days, and all contracts and agreements (including promissory notes) shall so state.

(Emphasis added).

HUD's regulations provide any non-exempt purchaser the right to rescind any promissory note related to the purchase of real estate subject to ILSA.  HUD clearly provided a purchaser the right to rescind a promissory note executed in favor of a lender because there is no language precluding that right of recovery. See  24 CFR. §§ 1715.1 and 1715.2.  Indeed, the Cooperative Defendants fail to cite any authority that contradicts HUD's interpretation of 15 U.S.C. § 1703. Limiting a party's right to rescind is contrary to Congress' intent that a party be able to obtain complete relief by rescinding the entire transaction.  The Plaintiffs right to rescind would be worthless unless the promissory notes held by Cooperative are unenforceable.

13

The Plaintiffs have adequately pled causes of action for rescission of the promissory notes held by Cooperative under ILSA in Counts I and II and Woodlands's motion to dismiss should be denied.

### C. Cooperative Defendants Violated the North Carolina Unfair And Deceptive Trade Practices Act.

#### 1. Elements Of The NCUDTPA.

In order to establish a violation of N.G.C.S. §75-1.1, the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA"), a plaintiff must show: "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to the plaintiff." Crouse v. Mineo, 189 N.C. App. 232, 658 S.E.2d 33, 42 (N.C. App. 2008).

#### 2. Cooperative's Arguments Do Not Address The Elements Of The NCUDTPA

Cooperative appears to make two arguments regarding the NCUDTPA. First, it argues that with regard to the property values of the real estate in question, Cooperative had no duty to make any representations to the Plaintiffs and therefore it could not have breached a duty that it did not have. This argument is misplaced. The question is whether Cooperative engaged in unfair or deceptive acts under the statute; it is not whether Cooperative breached some other common law duty. The duty that Plaintiffs allege Cooperative breached in this case is the same duty every defendant breaches when they violate the NCUDTPA: the duty not to engage in unfair and deceptive trade practices.

Second, Cooperative claims that it is not liable under the NCUDTPA because it did not make any misrepresentations to the Plaintiffs. A misrepresentation, however, is not an element required to establish a violation of the NCUDTPA. Plaintiffs do not have to prove or plead fraud, bad faith, or intentional deception to recover for unfair and deceptive trade practices.

14

Canady v. Mann, 107 N.C. App. 252, 260, 419 S.E.2d 597, 602 (N.C. App. 1992) (citations omitted).

### 3.  **Cooperative's Conduct Violated The NCUDTPA**

"What constitutes an unfair or deceptive practice is a somewhat nebulous concept. North Carolina courts base their determinations on the circumstances of each case." Gilbane Bldg. Co. v. Federal Reserve Bank of Richmond, Charlotte Branch, 80 F.3d 895, 903 (4th Cir. 1996) (citations omitted).  The N.C. Court of Appeals describes unfairness as conduct "which a court of equity would consider unfair."  Id. at 902 (citing Extract Co. v. Ray, 20 S.E.2d 59, 61 (1942)).  "[T]he fair or unfair nature of particular conduct is to be judged by viewing it against the background of actual human experience and by determining its intended and actual effects upon others."  Id. (citations omitted).  A trade practice is 'unfair' under North Carolina law if it offends established public policy, or is "immoral, unethical, oppressive, unscrupulous, or substantially injurious" to consumers. Id at 902 (citations omitted).   A practice is 'deceptive' if the act possesses a "tendency or capacity to mislead or creates the likelihood of deception." Gilbane at 903 (citations omitted).   "'Unfairness' is a broader concept than, and includes the concept of, 'deception'."   McDonald Brothers, Inc. v. Tinder Wholesale, LLC, 395 F.Supp.2d 255, 269 (M.D. N.C. 2005) (citations omitted).  "Either unfairness or deception can bring conduct within the purview of the statute; an act need not be both unfair and deceptive." Gilbane, 80 F.3d at 903 (citing Rucker v. Huffman, 99 N.C. App. 137, 392 S.E.2d 419, 421 (1990)).  "Moreover, where a party engages in conduct manifesting an inequitable assertion of power or position, such conduct constitutes an unfair act or practice."  Gray v. North Carolina Insurance Underwriting Association, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (N.C. 2000) (citations omitted).  Some of Cooperative's acts alleged in the Amended Complaint are

deceptive, and some acts are simply unfair.  It is not necessary that the Plaintiffs prove that

Cooperative committed actual fraud in order to establish a violation of the NCUDTPA.

Additionally, "'[t]his Court has repeatedly held that the violation of regulatory statutes which

govern business activities may also be a violation of N.C. Gen.Stat. § 75-1.1 whether or not

such activities are listed specifically in the regulatory act as a violation of N.C. Gen.Stat. § 75-

1.1.'" Richardson v. Bank of America, N.A., 182 N.C.App. 531, 555, 643 S.E.2d 410, 425-26

(citations omitted).

In asserting violations of the NCUDTPA, Plaintiffs have alleged numerous acts

omissions by Cooperative.  They include but are not limited to: (i) failing to take proper actions

to prevent harm to the Plaintiffs, knowing that they operated under false impressions due to

TRM's fraud; (ii) steering appraisals, deferring to TRM's selection of appraisers, and failing to

conduct independent review of appraisals; (iii) working with unlicensed TRM mortgage

brokers;  (iv) engaging in improper loan origination, underwriting, and closing procedures; (v)

failing to comply with the requirements of  the North Carolina Mortgage Lending Act; and (vi)

failing to comply with mandated loan-to-value regulations, with regulations concerning

specified down payments, with regulations requiring appraiser independence, and/or with

regulations limiting seller financial inducements. Am. Comp. ¶ 1138.  The Amended Complaint

is also replete with references to Cooperative's assistance and cooperation with TRM's overall

scheme to defraud the Plaintiffs.

The allegations are therefore more than sufficient to support Plaintiffs' claims that

Cooperative engaged in both unfair and deceptive practices.

**4.  Plaintiffs Properly Stated A Cause Of Action For Civil Conspiracy To Commit Fraud**

Cooperative conspired with TRM to commit fraud.  The elements of a civil conspiracy in North Carolina are: "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme."  Privette v. University of North Carolina, 96 N.C. App. 124, 139, 385 S.E.2d 185, 193 (1989)(citations omitted).   There is no independent cause of action for civil conspiracy.  Esposito v. Talbert & Bright, Inc., 181 N.C. App. 742, 641 S.E.2d 695 (N.C. App. 2007), cert. denied 362 N.C. 234, 659 S.E.2d 440 (2008).  This just means, however, the plaintiff must "allege an overt, tortious, or unlawful act which *any* defendant committed in furtherance of the conspiracy." Shope v. Boyer, 268 N.C. 401, 405, 150 S.E.2d 771, 773 (N.C. 1966)(emphasis added).  Stated succinctly,

> [a] claim for damages resulting from a conspiracy exists where there is an agreement between two or more persons to do an unlawful act or to do a lawful act in an unlawful way and, as a result of acts done in furtherance of, and pursuant to, the agreement, damage occurs to the plaintiff. In such a case, all of the conspirators are liable, jointly and severally, for the act of any one of them done in furtherance of the agreement.

Fox v. Wilson, 85 N.C.App. 292, 301, 354 S.E.2d 737, 743 (N.C. App. 1987)(citations omitted).

In this case, TRM perpetrated a fraud against the Plaintiffs through the scheme set forth in the allegations contained in the Amended Complaint.  Cooperative agreed to participate in this scheme through its overt actions, as set forth in the Amended Complaint, for example:

- Cooperative, through its employees and agents, agreed to participate in TRM's fraudulent scheme by, among other things, knowingly and intentionally concealing material facts relative to the fair market value of the lots in Summerhouse and Cannonsgate, soliciting and obtaining inflated appraisals for those lots, working with unlicensed TRM mortgage brokers, failing to

communicate at all with Cooperative Plaintiffs and instead communicating with TRM, ignoring loan origination, underwriting, or closing procedures mandated by law, and failing to comply with the provisions of the NCMLA. Am. Comp. ¶ 1154.

- Cooperative and TRM agreed to engage in an illegal conspiracy by arranging for and providing financing in an unlawful manner. Am. Comp. ¶ 1155.

- Cooperative committed the overt act of agreeing with TRM's selection, or itself selecting, an appraiser for each lot it financed who could be relied upon to inflate the appraised value, and working with unlicensed TRM mortgage brokers. Am. Comp. ¶ 1156.

- TRM committed the overt act of agreeing with Cooperative's selection, or itself selecting, an appraiser for each lot it financed who could be relied upon to inflate the appraised value. Am. Comp. ¶ 1157.

As argued above in this Memorandum, FIRREA and the regulations adopted thereunder specifically preclude lenders from influencing or steering appraisals. As a result of FIRREA, state governments either began regulating appraisals or modified their existing appraisal laws. In North Carolina it is now a Class 1 misdemeanor for an appraiser to make "any willful or negligent misrepresentation or any willful or negligent omission of material fact;" or " [to accept] an appraisal assignment when the employment is contingent upon the appraiser reporting a predetermined result, analysis, or opinion, or when the fee to be paid for the performance of the appraisal assignment is contingent upon the opinion, conclusion, or valuation reached or upon consequences resulting from the appraisal assignment;" or to perform "any other act which constitutes improper, fraudulent, or other dishonest conduct." N.C.G.S. §§ 93E-1-12(a)(2), (3) and (10) and 93E-1-13. In addition, the North Carolina Appraisal Board requires all appraisers to comply with the Uniform Standards of Professional Appraisal Practice. N.C.A.C. §57A.0501 (2008). These Standards in turn mandate appraiser independence. Paragraphs 923 and 924 specifically allege that Cooperative's and TRM's overt acts in the

18

conspiracy were selecting appraisers based upon a predetermined result. Cooperative and TRM

violated the North Carolina Appraisers Act.  But that is not all.

TRM and Cooperative violated the North Carolina Mortgage Lending Act ("NCMLA"),

N.C.G.S. §§ 53-243.01 to 53-244 (2009).  The pertinent definitions under the NCMLA are:

> (1) Act as a mortgage broker - To act  for compensation or gain, or in the expectation
> compensation or gain, either directly or indirectly, by accepting or offering to accept an
> application for a mortgage loan, soliciting or offering to solicit a mortgage loan,
> negotiating the terms or conditions of a mortgage loan, issuing mortgage loan
> commitments or interest rate guarantee agreements to borrowers, . . . , whether such acts
> are done through contact by telephone, by electronic means, by mail, or in person with
> the borrowers or potential borrowers.
>
> . . . .
>
> (13) Licensee. – A loan officer, limited loan officer, mortgage broker, or mortgage
> banker who is licensed pursuant to this Article.
>
> . . . .
>
> (18) Mortgage broker. – A person who acts as a mortgage broker as that term is defined
> in subdivision (1) of this section. The term "mortgage broker" includes an exclusive
> mortgage broker, except when expressly provided otherwise.
>
> (19) Mortgage loan. – A loan made to a natural person or persons primarily for personal,
> family, or household use, primarily secured by either a mortgage or a deed of trust on
> residential real property located in North Carolina.
>
> . . . . .
>
>  (27) Residential real property. – Real property located in the State of North Carolina
> upon which there is located or is to be located one or more single-family dwellings or
> dwelling units.

N.C.G.S. § 53-243.01.

In this instance, TRM acted as a "mortgage broker."  It accepted and/or solicited loan

applications from the Plaintiffs and negotiated the terms and conditions of the "mortgage loan"

with Cooperative.  Plaintiffs never spoke with or dealt with a Cooperative representative. The

"mortgage loan" was on residential real property located in North Carolina, upon which there is

to be located a single-family dwelling.

Under § 53-243.02 (b), TRM was required to be licensed because "[i]t is unlawful for any natural person to engage in the solicitation and acceptance of applications for mortgage loans without first obtaining a license as a loan officer, limited loan officer, mortgage banker, or mortgage broker issued by the Commissioner under the provisions of this Article." In addition, TRM also violated the NCMLA by engaging in unlawful prohibited acts under § 53-243.11, which make in unlawful in a mortgage transaction:

> (1) To misrepresent or conceal the material facts or make false promises likely to influence, persuade, or induce an applicant for a mortgage loan or a mortgagor to take a mortgage loan, or to pursue a course of misrepresentation through agents or otherwise.
>
> . . . .
>
> (4) To pay, receive, or collect in whole or in part any commission, fee, or other compensation for brokering a mortgage loan in violation of this Article, including a mortgage loan brokered by any unlicensed person other than an exempt person.
>
> . . . .
>
> (8) To engage in any transaction, practice, or course of business that is not in good faith or fair dealing or that constitutes a fraud upon any person, in connection with the brokering or making of, or purchase or sale of, any mortgage loan.
>
> . . . .
>
> (11) To influence or attempt to influence through coercion, extortion, or bribery, the development, reporting, result, or review of a real estate appraisal sought in connection with a mortgage loan.

N.C.G.S. § 53-243.11 (pre-2007 revision)(see S.L. 2007-352), attached hereto as **Exhibit A**.

Cooperative also had these same affirmative obligations. While sub-subdivision (8)(c) of the definitions in § 53-243.01 exempts banks for the operation of the NCMLA, it does not exempt banks from the prohibitions of N.C.G.S. §53-243.15. For the reasons articulated above, Cooperative violated many of the same provisions of NCMLA as TRM.

What is more, under § 53-243.10 mortgage brokers and those required to be licensed in North Carolina have numerous affirmative duties, in addition to duties imposed by other statutes or at common law:

(2) Follow reasonable and lawful instructions from the borrower;

(3) Act with reasonable skill, care, and diligence;

(4) Make reasonable efforts, with lenders with whom the broker regularly does business to secure a loan that is reasonably advantageous to the borrower considering all the circumstances, including the rates, charges, and repayment terms of the loan and the loan options for which the borrower qualifies with such lenders.

N.C.G.S. §53-243.10 (pre-2007 revision)(see S.L. 2007-352).

Again, for the reasons articulated above, TRM violated these affirmative duties. To sum up this discussion regarding a civil conspiracy to defraud, TRM and Cooperative combined to do unlawful acts or to do a lawful acts in an unlawful way; resulting in injury to Plaintiffs inflicted by one or more of the conspirators; and pursuant to a common scheme. The nub of the conspiracy is that TRM set out to defraud the Plaintiffs by using inflated appraisals and phony loan applications. TRM made the misrepresentations directly to Plaintiffs. But in order to carry out the fraud, TRM needed the willing and knowing assistance of Cooperative, which either selected a corrupt appraiser or allowed TRM to make such a selection. Cooperative also allowed an unlicensed broker to originate its mortgages, and its loan officer and the underwriter overlooked TRM's falsification of income and assets. It should be noted that the overt act need only be committed by one or more of the conspirators. Shope, 150 S.E.2d at 774. Both Cooperative and TRM violated common law and statutory duties, which proximately caused the Plaintiffs to suffer injuries, namely to be legally obligated to pay promissory notes on grossly

under-collateralized loans.  Id. ("Accurately speaking, there is no such thing as a civil action for conspiracy.  The action is for damages caused by acts committed pursuant to a formed conspiracy, rather than the conspiracy itself; and unless something is actually done by one or more of the conspirators which results in damage, no civil conspiracy lies against anyone").  For these reasons, the Motion to Dismiss pertaining to Count XXXIII should be denied.

## II.    THIS COURT HAS SUPPLEMENTAL JURISDICTION OVER THE COOPERATIVE DEFENDANTS.

This Court has original jurisdiction over the Complaint based on violations of the Interstate Land Sales Full Disclosure Act ("ILSA"), 15 U.S.C. § 1701, *et seq.*  This Court may exercise supplemental jurisdiction over all other claims that form part of the same case or controversy and because the Cooperative Defendants are necessary parties to the litigation. 28 U.S.C. § 1367.   Plaintiffs have alleged violations of ILSA regarding their purchase of unimproved real estate against numerous Defendants.   In connection with these violations, Plaintiffs have sought the revocation of their purchases, including the promissory notes, pursuant to 15 U.S.C. § 1703.  Since the Cooperative Defendants are the beneficiary and trustee, respectively, of the purchase money deeds of trust encumbering the lots which are the subject of the claims for revocation, they are necessary parties to the claims asserted by Plaintiffs under ILSA.

"The cases are virtually unanimous in holding that in suits between parties to a contract seeking rescission of that contract, all parties to the contract, and others having a substantial interest in it, are necessary parties."  Delta Financial Corp., v. Paul D. Comanduras & Associates, 973 F.2d 301, 305 (4th Cir. 1992).  The Cooperative Defendants have a significant

interest in the lots purchased by the Plaintiffs that almost certainly exceeds the value of such

lots.  The Cooperative Defendants, as holders of promissory notes, have a substantial interest in

the revocation of the Plaintiffs transactions and this Court may exercise supplemental

jurisdiction over the claims against the Cooperative Defendants.

Additionally this Court may exercise supplemental jurisdiction as to the Cooperative

Defendants because the state and federal claims asserted in the Amended Complaint all derive

from a common nucleus of operative fact.  United Mine Workers v. Gibbs, 383 U.S. 715, 86

S.Ct. 1130 (1966).  In Gibbs, the Supreme Court articulated the standard for a federal court's

exercise of pendent jurisdiction over related state claims:

> The state and federal claims must derive from a common nucleus of operative
> fact. But if, considered without regard to their federal or state character, a
> plaintiff's claims are such that he would ordinarily be expected to try them all in
> one judicial proceeding, then, assuming substantiality of the federal issues, there
> is power in federal courts to hear the whole.

383 U.S. at 725, 86 S.Ct. at 1138.

The Amended Complaint sets forth in detail how the claims against Cooperative  are

part of the same case or controversy against all of the Defendants. The actions of Cooperative

do not exist in a vacuum. If the claims in the Amended Complaint are considered without regard

to their federal or state character, Plaintiffs' would be expected to try them in one judicial

proceeding. See Id.   The Court need only consider the breadth of the scheme that Plaintiffs

allege was undertaken, which could only have succeeded—in fact, could only have existed—

with the cooperation of all Defendants, including Cooperative.  Am. Comp. ¶¶  455-480.  The

Amended Complaint sets forth the entirety of the unlawful scheme and Cooperative's integral

participation in it.  Without the participation of Cooperative, the unlawful scheme could not

have been accomplished.

The Court, in deciding to issue supplemental jurisdiction, may also consider "judicial economy, convenience and fairness to litigants." Gibbs, 383 U.S. at 726, 86 S.Ct. at 1139. If separate actions were maintained against individual Defendants, Plaintiffs would almost certainly have to introduce evidence of the details of all of the Defendants' participation in order to provide context for the individual acts of each Defendant.  Each trial would become an exercise in inefficiency and redundancy.

The Cooperative Defendants are necessary parties to this action and the claims against the Cooperative Defendants are part of the same case or controversy against all of the Defendants.  Therefore, this Court may exercise supplemental jurisdiction over the claims against the Cooperative Defendants, and the Motion to Dismiss should be denied.

### III.    VENUE IS PROPER IN THE EASTERN DISTRICT OF VIRGINIA

Venue is proper in the Eastern District of Virginia if "a substantial part of the events or omissions giving rise to the claim" occurred here.  28 U.S.C. § 1391(b)(2). A substantial part of the events and omissions took place in this district.  In addition, because the Plaintiffs have asserted causes of action under ILSA, venue is proper because defendants reside in this district and offers for the sale of real estate were made in the Eastern District of Virginia.  15 U.S.C. § 1719.

Defendants TRM, Mark Dain and Mark Jalajel were the masterminds of the fraudulent enterprise which is the subject of this suit.  Am. Comp. ¶¶ 106-121, 129-133.  Defendant TRM's principal place of business was in Woodbridge, Virginia. Am. Comp.  ¶ 79.  Mark Dain and Mark Jalajel both reside in this district. Am. Comp. ¶¶ 80-81.  Plaintiffs who obtained loans from Defendant Cooperative, with the exception of Plaintiffs Freed and Keeton, are residents of this district.  Am. Comp. ¶¶ 1-78.

The scheme was marketed through "seminars" in Northern Virginia.  Am. Comp., ¶ 242 and Ex. 4.  In most cases, the Plaintiffs signed the contracts in Northern Virginia.  In most cases, the Plaintiffs signed settlement papers, including the notes and deeds of trust, in Northern Virginia.  Am. Comp. ¶ 197.    In most cases, loan applications were prepared and submitted to the Plaintiffs in Northern Virginia.  Cooperative, being in possession of loan applications and settlement documents, was aware of the Plaintiffs' residences and was aware of where notes and deed of trust were executed by the Plaintiffs.  Cooperative was working with an unlicensed mortgage broker and loan officers from TRM (Am. Comp. ¶ 1138), who were operating from TRM's offices in Northern Virginia.

 The serial misrepresentations that form the bedrock of the fraudulent enterprise were made in Northern Virginia.  Cooperative agreed to participate in this fraudulent scheme and engaged in an illegal conspiracy with TRM.  Am. Comp. ¶¶ 1153-1160.

Since the planning and execution of the enterprise was substantially carried out within the Eastern District of Virginia, venue is proper in this matter pursuant to 28 U.S.C. § 1391(b)(2) and 15 U.S.C. § 1719.  For the reasons stated above, the Cooperative Defendants' Motion to Dismiss for improper venue should be denied.

### IV.    THE COURT HAS PERSONAL JURISDICTION OVER THE COOPERATIVE DEFENDANTS.

In determining whether personal jurisdiction exists, the Court should apply all the reasonable facts and inferences and apply them in the light most favorable to the plaintiffs.  Carefirst, Inc. v. Carefirst Pregnancy Centers, Inc., 334 F.3d  390, 396 (4th Cir. 2003).  Cooperative Defendants knowingly issued sixteen promissory notes to residents of Virginia over a six month period in 2007.  Despite argument to the contrary, this is not a case of one

minor interaction or an inadvertent contact with residents of Virginia. The Court should apply

Virginia's two step analysis in determining whether it can exercise personal jurisdiction over

the Cooperative Defendants. Fed. R. Civ. P. 4(k)(1)(A). Courts in Virginia may exercise

personal jurisdiction when the long-arm statute is applicable and whether that exercise of

personal jurisdiction satisfies due process. Mitrano v. Hawes, 377 F.3d 402, 406 (4th Cir.2004).

### A. The Virginia Long-Arm Statute Applies to the Cooperative Defendants.

The Virginia long-arm statute states in relevant part:

> A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's:
>
> 1.    Transacting any business in this Commonwealth;
>
> 2.    Contracting to supply services or things in this Commonwealth.

Virginia Code §8.01-328.1

"The function of [the Virginia] long-arm statute is to assert jurisdiction over

nonresidents who engage in some purposeful activity in Virginia, to the extent permissible

under the Due Process Clause of the Constitution of the United States." Glumina Bank d.d. v.

D.C. Diamond Corp., 259 Va. 312, 317, 527 S.E.2d 775, 777 (2000) (citations omitted).

Virginia's long arm statute is a "single transaction" statute. Kolbe v. Chromodern, Inc., 211 Va.

736, 180 S.E.2d 664 (1971). Cooperative availed itself of the laws of Virginia by providing

financing for the purchase of real estate to citizens of Virginia.

Defendant Cooperative provided mortgages to Plaintiffs who reside in Virginia. Am.

Comp. ¶¶ 5, 6, 9, 20, 27, 32, 35, 37, 39, 43, 48, 52, 53, 56 and 71, Exhibit 110. In most cases,

the notes and deeds of trust were executed by the Plaintiffs in Virginia. See Am. Comp. ¶ 197.

According to the HUD-1 settlement statements, most of which were executed by the Plaintiffs

in Virginia, Defendant Cooperative received loan origination fees from Plaintiffs who resided in Virginia. Further, a large part of Plaintiffs' claim against Defendant Cooperative is its cooperation with and willing participation in TRM's fraudulent enterprise, which was executed primarily through acts committed in Virginia.

The Virginia Supreme Court addressed a similar circumstance in <u>Krantz v. Air Line Pilots Assoc. Intern</u>, 245 Va. 202, 427 S.E.2d 326 (1993), in which the plaintiff asserted a claim of tortious interference of contract against a New York resident. The defendant did not enter Virginia; rather, from his computer in New York, he made use of a private bulletin board on a closed computer system, based in Virginia, to recruit others to assist him in his plan. The Virginia Supreme Court stated:

> Without the use of [the computer system], a Virginia facility, [the defendant] could not have obtained those recruits, and there would have been no interference with [the plaintiff's] prospective contract, . . . Thus, [the defendant's] use of [the computer system] in Virginia as a means of furthering his plan to block [the plaintiff's] employment was "an act . . . in this Commonwealth" within the meaning of Code § 8.01-328.1(A)(3).

245 Va. at 206, 427 S.E.2d at 328 (citations omitted). Here, in addition to Cooperative's participation in a fraudulent enterprise taking place in Virginia, Cooperative could not have consummated the loans to Plaintiffs residing in Virginia without the cooperation of TRM employees obtaining the signatures of Plaintiffs on settlement documents in Virginia. Cooperative made loans to Virginia residents, obtained loan origination fees from Virginia residents, and availed itself of the cooperation of a Virginia corporation (TRM) in obtaining Plaintiffs' signatures on notes, deeds of trust and other necessary settlement documents in Virginia. These actions plainly fall within the scope of "transacting business" and "contracting to supply services or things" in Virginia.

The cases cited by the Cooperative Defendants fail to support a conclusion that the

Virginia Long Arm statute does not apply.  Unlike the facts in Ajax Realty Cooperative directly

benefited from its transactions with the Plaintiffs.  Cooperative directly provided financing to

the Plaintiffs.  In Ajax Realty, the manufacturer only accommodated its buyer by sending the

windows purchased by a third party to Virginia and was not obtaining business for itself. Ajax

Realty Corp. v. Zook, 493 F.2d 818, 821 (4th Cir. 1972).  Cooperative Defendants reliance on

Viers v. Mounts is also misplaced. The sole contact in Virginia involved a disputed oral contract

that was formalized in Virginia. Viers v. Mounts, 466 F.Supp. 187 (D.C.Va. 1979).  In the

present case, Cooperative provided 16 promissory notes to residents of Virginia.  Cooperative

repeatedly entered into Virginia to transact business.  This Court may apply the Virginia long

arm statute.

### B.  Due Process is Satisfied by this Court Exercising Personal Jurisdiction over the Cooperative Defendants.

The Due Process requirement is satisfied by this Court exercising personal jurisdiction

against the Cooperative Defendants.  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 105 S.Ct.

2174, the Supreme Court stated:

> Thus where the defendant "deliberately" has engaged in significant activities
> within a State, or has *created "continuing obligations" between himself and
> residents of the forum*, he manifestly has availed himself of the privilege of
> conducting business there, and because his activities are shielded by "the benefits
> and protections" of the forum's laws it is presumptively not unreasonable to
> require him to submit to the burdens of litigation in that forum as well. [citations
> omitted]

471 U.S. at 475-476, 105 S. Ct. at 2184 (emphasis added).  The Cooperative Defendants, by

deliberately entering into promissory notes and deeds of trust with residents of Virginia and by

maintaining bank accounts with them from which payments were withdrawn for over a year and

continue to be withdrawn, have submitted themselves to the jurisdiction of this forum. The

Cooperative Defendants do not claim that Plaintiffs unilaterally entered into these agreements.

Having contracted with Virginia residents, and created "continuing obligations" with them,

Cooperative cannot now claim that they are not subject to jurisdiction in Virginia. For the

reasons stated above, the Cooperative Defendants Motion to Dismiss for lack of personal

jurisdiction should be denied.


WHEREFORE, the Plaintiffs request that this Court deny Cooperative Bank for

Savings, Inc. and Frederick Willetts, III's Motion to Dismiss.

Dated: June 11, 2009

Respectfully submitted,

PESNER | KAWAMOTO| CONWAY
a professional law corporation

By: /s/ Martin C. Conway
Martin C. Conway, VSB 34334
S. Jill Pisner, VSB 31227
John C. Altmiller, VSB No. 34902
7926 Jones Branch Drive, Suite 930
McLean, Virginia 22102
Telephone: 703-506-9440
Facsimile: 703-991-2274
jpisner@pkc-law.com
mconway@pkc-law.com
Counsel for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

        I hereby certify on this 11th day of June, 2009, that a true copy of the foregoing Memorandum in Opposition to Cooperative Bank's Motion to Dismiss the Amended Complaint was served electronically through the CM/ECF, automatically providing notice to all registered counsel.  I hereby certify that I will mail a true copy of the foregoing to the following non-registered parties:

Mark Dain
1302 Yates Circle
Fredericksburg, Virginia 22401

Steven Ramsdell, Esquire
Tyler, Bartl, Gorman, & Ramsdell, P.L.C
700 South Washington Street Suite 216
Alexandria, Virginia 22314
*Bankruptcy Counsel for Mark Jalajel*

Michael McCracken
6488 Palisades Drive
Centreville, Virginia 20121

Cari Deuterman
11795 Antietam Road
Woodbridge, Virginia 22192

Charles T. Busby, Esquire
Post Office Box 396
Hampstead, North Carolina 28443

Madrid Investment Holdings, LLC
Robert Dain, Registered Agent
1810 Michael Faraday drive, Suite 102
Reston, Virginia 20190

Martin J. Yeager, Esquire
Bean, Kinney & Korman PC
2300 Wilson Boulevard, 7th Floor
Arlington, Virginia 22201
(703) 525-4000
(703) 525-2207 (fax)
myeager@beankinney.com
*Counsel for Total Realty Management, LLC*

Jeffrey T. Null
4317 Ramsey Street
Fayetteville, North Carolina 28311

By: _____/s/  Martin C. Conway_____
Martin C. Conway, VSB 34334
John C. Altmiller, VSB 34902
S. Jill Pisner, VSB 31227
PESNER | KAWAMOTO | CONWAY, PLC
7926 Jones Branch Drive, Suite 930
McLean, Virginia 22102
703-506-9440
703-991-2274 (fax)
jpisner@pkc-law.com
*Counsel for Plaintiffs*